IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| FEDERAL EXPRESS CORPORATION<br><br>　　　Plaintiff,<br><br>v.<br><br>MY PILLOW, INC. and MICHAEL J. LINDELL<br><br>　　　Defendant. | Civil Action No. 2:25-cv-02222-JPM-atc |

# FIRST AMENDED COMPLAINT

Plaintiff, Federal Express Corporation ("FedEx"), files this First Amended Complaint against Defendants My Pillow, Inc. ("My Pillow") and Michael J. Lindell ("Lindell") and for FedEx's claims for relief states as follows:

## PARTIES

1. Federal Express Corporation is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Memphis, Tennessee.

2. My Pillow, Inc. is a Minnesota corporation with its principal place of business in Chaska, Minnesota. It may be served with this Complaint through either its registered agent for service, Doug Wardlow, or its CEO Michael Lindell both located at 1550 Audubon Road, Chaska, MN 55318.

3. Michael J. Lindell is a natural person who is a citizen of and domiciled in the State of Minnesota and may be served with this Complaint at 1550 Audubon Road, Chaska, MN 55318, or any other place where he may be found.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this entire action pursuant to 28 U.S.C. § 1332 because this is a civil action where the amount in controversy exceeds $75,000 and is between citizens of different States. Specifically, FedEx is a citizen of the States of Delaware and Tennessee while My Pillow and Lindell are citizens of the State of Minnesota.

5. This Court has personal jurisdiction over My Pillow because, as more fully shown below, My Pillow transacted business in Tennessee, including by entering into the contract made the basis of this suit that was to be performed in whole or in part in Tennessee. Further, My Pillow engaged in interstate communications with FedEx in Tennessee and contracted for services to be provided in Tennessee.

6. This Court has personal jurisdiction over Lindell because, as more fully shown below, he engaged in interstate communications with FedEx in Tennessee and his misrepresentations were targeted to have an impact on FedEx's headquarters and operations, located in Tennessee.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because this judicial district is where a substantial part of the events or omissions giving rise to the claims in this suit occurred. Specifically, the majority of the injuries to FedEx occurred in the Western District of Tennessee. Defendants utilized FedEx's computer systems, which are housed primarily in the Western District of Tennessee, the FedEx computer systems that allowed Defendants to open and misuse the subject shipping accounts are maintained in the Western District of Tennessee, and the majority of the FedEx shipping network used by Defendants is routed through the Western District of Tennessee.

**FACTS**

8. This suit has become necessary to collect almost $9 million owed by My Pillow for shipping services provided by FedEx for which My Pillow has failed to pay despite multiple pre-litigation efforts. My Pillow was only allowed to achieve this level of debt based on the fraud of Lindell, who repeatedly misrepresented Defendants' willingness and ability to pay for shipments placed with FedEx in order to induce FedEx to continue shipping for My Pillow, including through the peak holiday season at the end of 2024.

9. The contractual relationship between FedEx and My Pillow most recently goes back to February 2021 when FedEx and My Pillow's predecessor, MP Distribution, LLC, entered into a Transportation Services Agreement (the "Contract"). Over the next several years, the Contract was amended several times to adjust pricing and allow for corporate changes requested by My Pillow's representatives, employees and agents. Most recently, and relevant to the invoices at issue in this lawsuit, My Pillow signed an Amendment to the Contract on January 10, 2024, which set forth the existing terms and conditions under which My Pillow was authorized to ship packages through the FedEx enterprise.

10. Importantly, the Contract incorporates the FedEx Service Guide (in effect at the time of each shipment) and the terms and conditions thereof. In this regard, the relevant version of the FedEx Service Guide provides, among other things, that "[t]he party to whom a FedEx account number is issued is liable for all charges to the account…". The Contract and the Service Guide both mandate that invoices are due and payable within fifteen (15) days from the invoice date and the Service Guide specifies that late fees equal to 8% of total past-due balances may be applied to invoices not timely paid. The Service Guide also establishes that senders and/or shippers

responsible for payment are liable for costs to collect payment, including attorney's fees, interest and court costs.

11. Beginning January 2024, My Pillow started slow paying its invoices. By December 2024, My Pillow materially violated the terms of its Contract with FedEx when it stopped making payments altogether and which left invoices going back to September 2024 open and unpaid. Despite multiple promises to pay by Lindell, My Pillow's owner, and various suggested payment plans, delinquencies increased. As a result, per the terms of the Contract, FedEx placed My Pillow's account on a cash-only basis and stopped shipping for My Pillow as of December 2024.

12. On January 13, 2025, My Pillow was sent written notice advising that its shipping accounts with FedEx would be terminated altogether in thirty (30) days due to non-payment of outstanding invoices. Demand was also made for payment of all outstanding invoices, then totaling more than $8.5 million. My Pillow was advised that if payment was not received within thirty (30) days, FedEx would exercise all legal rights and remedies available to it. Despite the foregoing notification and demand, My Pillow has not made any payments since receipt of the January 2025 letter.

13. My Pillow was only allowed to continue shipping with FedEx and to incur the outstanding debt currently owed because of repeated, intentional misrepresentations made by Lindell that were specifically designed to, and actually did, induce FedEx to allow My Pillow to continue shipping on credit with FedEx, even though Lindell knew the representations he was making were false when they were made and that neither he nor My Pillow had any intention of actually satisfying the debt owed to FedEx.

14. A continuing theme in Lindell's communications with FedEx was that funds were available, on the way, and that FedEx would receive payment at any moment bringing My Pillow's

4

debt current. Relevant to the debt at issue in this case, the misrepresentations started in the fall of 2024 with the FrankSpeech (now known as Mike Lindell Media, Corp.) initial public offering that was controlled by Lindell. On August 29, 2024, FrankSpeech announced it was going public and offered stock shares for sale to the public. Leading up to this announcement, Lindell represented to a FedEx Senior Manager of Revenue Service Operations. that Lindell would generate at least $20,000,000 in funds from the IPO and that he would use these funds to pay My Pillow's debt to FedEx. Lindell followed this conversation with text messages to assure FedEx of his representations including on August 7, 2024 saying "Good news is we are merging as we speak…but can't announce until we get the name change. Then we will have the funds for backend." In this context, "backend" referred to the oldest invoices owed by My Pillow, which, at that time, went as far back as January 2024. On August 27, 2024, Lindell again assured the FedEx Senior Manager to keep shipping on credit for My Pillow promising that funds were on their way. He texted: "Larry I have great news!!!! Stock approved…live Thursday" referring to the FrankSpeech IPO which had not yet been made public. Lindell did not use the funds he generated from this IPO to pay My Pillow's debt to FedEx as he had promised.

15. Shortly thereafter, Lindell promised FedEx that it would get paid from various loans Lindell was obtaining. This included a collateralized loan in the amount of $25,000,000 and a bridge loan Lindell was going to obtain to provide cash flow for My Pillow until the $25,000,000 collateralized loan was finalized. On September 10, 2024, Lindell texted the FedEx Senior Manager assuring him of the funding by providing a letter on My Pillow letterhead, purportedly signed by Jeremiah Pilon, as Deputy General Counsel for My Pillow. The letter was very specific stating: "I am writing to inform [FedEx] that we have secured collateralized funding in the amount of $25 million. This letter is to confirm FedEx's payment priority from the secured funds

5

amounting to $25 million. The $25 million of secured funds are set for disbursement on or before September 30, 2024. We have allotted payment from this dipersment [sic] to FedEx in the amount of $3,000,000 on the date of disbursement." Whatever funds Lindell derived from these loans were not used to pay My Pillow's debt to FedEx as Lindell promised.

16. Lindell also promised FedEx that it would get paid from a high-end stock option opportunity he was offered. Specifically, Lindell promised that the money received from the purchase and sale of specific stock options would generate sufficient funding by January 2025 to fully pay FedEx. Lindell stated that the investment included SpacEx stock, which was projected to produce high dollar returns that would be used to pay FedEx. On December 20, 2024, Lindell texted the FedEx Senior Manager to assure him the funding was forthcoming stating "The broker called and it sounds like the stock should be for sure in January." This too never happened and whatever funds Lindell generated from this stock scheme were not used to pay FedEx.

17. Similarly, Lindell repeatedly promised that he was personally going to pay FedEx for My Pillow's shipping debts if the company was not able to generate sufficient funds to pay its own debts. At one point, on November 30, 2024, Lindell sent the FedEx Senior Manager an investment statement identifying an investment account with Forte Capital Group, held in Lindell's name, indicating investment assets of almost $14,000,000. But Lindell either immediately diverted those funds or otherwise spent them because he has never used them to pay FedEx for any of My Pillow's debt as he promised.

18. From late October 2024 through December 2024, Lindell also repeatedly represented to FedEx that he had as much as $5,000,000 being held in an "escrow account" by his merchant server due to a UCC-1 filing that he signed to secure a loan with a merchant cash advance lender at a very high interest rate. Lindell advised that he obtained a release of the UCC-1 filing but was

6

having some trouble obtaining a release of the escrow funds. Lindell promised that he was going to obtain a return of the funds and use them to pay the My Pillow debt to FedEx. This never happened.

19. With respect to all of these representations made by Lindell, he made them at a time that he was informed FedEx was in the process of revoking My Pillow's credit privileges, stopping shipments for My Pillow altogether, or turning over My Pillow's accounts to debt collectors. Thus, Lindell made representations to prevent each of these things from happening but Lindell knew his representations were false when they were made and he specifically intended FedEx to rely on the representations to keep shipments moving through the FedEx system on credit.

20. FedEx did rely on Lindell's representations and allowed My Pillow to continue shipping on credit. Between August of 2024 and the time that FedEx terminated My Pillow's accounts, the My Pillow debt ballooned from approximately $5.5M to $8.8M based solely on the misrepresentations made by Lindell. Indeed, had Lindell fulfilled his representations, FedEx would not have suffered this increase in debt owed by My Pillow and would have either stopped shipping for My Pillow altogether or revoked My Pillow's credit privileges so that any shipments made would have to be pre-paid in advance.

21. This action has become necessary to collect amounts due and owing to FedEx, which continue to accrue, including late fees. My Pillow's debt to FedEx currently totals at least $8,808,860.85. Lindell's misrepresentations caused FedEx to incur at least $3.3M of this total debt that it would not have incurred but for Lindell's conduct.

## COUNT I
## BREACH OF CONTRACT

22. The allegations in paragraphs 8 to 21 are incorporated by reference as if set forth fully herein.

23. My Pillow entered into the Contract with FedEx wherein, among other things, My Pillow promised to pay for all shipments made through the FedEx enterprise.

24. My Pillow materially breached the Contract by failing and refusing to pay invoices for shipments it placed with FedEx.

25. As a direct and proximate result of My Pillow's breaches of the Contract, FedEx has been damaged. Specifically, My Pillow owes at least $8,808,860,85, as of the filing of this Complaint, for unpaid shipping charges and late fees. In addition, My Pillow is liable for FedEx's legal fees associated with this action, pre-judgment and post-judgment interest and all court costs made necessary by its conduct.

## COUNT II
## UNJUST ENRICHMENT (Alternative)

26. The allegations in paragraphs 8 to 25 are incorporated by reference as if set forth fully herein.

27. Alternatively, should My Pillow be found not liable to FedEx for breach of contract, My Pillow is nonetheless obligated to pay FedEx for shipping services that FedEx provided to My Pillow but for which My Pillow failed and refused to pay.

28. As a direct and proximate result of My Pillow's unlawful and improper conduct, as described above, My Pillow was conferred benefits by FedEx in the form of shipping services. My Pillow was aware it was receiving such benefits and accepted them under such circumstances that it would be unfair, unjust and inequitable for My Pillow to retain these benefits without payment. Specifically, My Pillow was unjustly enriched with shipping services from FedEx for which My Pillow has failed and refused to pay. Accordingly, in the alternative, My Pillow is liable to FedEx under a theory of unjust enrichment for the value of shipping services provided by FedEx.

## COUNT III
## FRAUD

29. The allegations in paragraphs 8 to 28 are incorporated by reference as if set forth fully herein.

30. Lindell is liable to FedEx for fraud. The representations made by Lindell, described herein, were of material facts and intentionally made by him recklessly or with knowledge that the representations were false when made. FedEx reasonably relied on the representations in not revoking My Pillow's credit privileges or stopping shipping altogether for My Pillow. This allowed My Pillow to continue to ship on credit and its debt to increase by at least $3,300,000, which would not have otherwise occurred but for the misrepresentations made by Lindell. As a result, Lindell's misrepresentations were the direct and proximate cause of damages totaling at least $3,300,000, particularly given that Lindell has represented that My Pillow is financially incapable of paying its full debt to FedEx.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that Defendants be summoned to appear herein, and that upon final adjudication of this matter, Plaintiff have and recover the following from Defendants:

(a) Actual damages;

(b) Attorneys' fees incurred to enforce FedEx's contractual rights, including through final judgment and upon any unsuccessful appeals;

(c) Punitive or exemplary damages;

(d) Prejudgment and post-judgment interest on these sums at the highest applicable rate;

(e) Costs of court; and

(f) All other and further relief as the Court may deem equitable and just.

Respectfully submitted,

/s/ *Jason R. Bernhardt*
Jason R. Bernhardt
FEDERAL EXPRESS CORPORATION
Bar No. 24045488
3620 Hacks Cross Road
Building B – 3rd Floor
Memphis, Tennessee 38125
Telephone:  (901) 434-8541
Facsimile:   (901) 434-9279
jasonbernhardt@fedex.com
*Counsel for Plaintiff Federal Express Corporation*